## STITZ v. NATIONAL PRODUCING & REFINING CO. et al.  (No. 6841.)

(Court of Civil Appeals of Texas. San Antonio. Dec. 13, 1922. Rehearing Denied Jan. 24, 1923.)

1. **Mines and minerals** ⊚⇒74—**Exception to paragraph of petition to cancel lease relating to intention of assignee as to developing lease held properly sustained.**

Where a lease by its terms was assignable without modification or restriction as to persons or purposes, an assignee's obligations were determinable alone from the contract, and not from his motives in purchasing the lease, and hence, in suit for cancellation, sustaining exceptions to a paragraph of the petition alleging facts intended to show that he did not acquire the lease with an honest intention of developing it was not error.

2. **Appeal and error** ⊚⇒256—**Failure to except to action of court in striking pleadings waived error therein.**

Failure to except to the action of the court in striking pleadings, waived any error therein.

3. **Mines and minerals** ⊚⇒77—**Lease once vitalized by commencement of well held forfeitable only by abandonment or notice as provided therein.**

A provision that lessee was to have the land "for five years from date and during the continuance of actual work or drilling by said lessee or his assignee, and for as long thereafter as oil or gas or coal or other minerals are found thereon in paying quantities," when considered with the entire contract, which, among other things, gave lessee the right to remove machinery and other things at any time, required lessee to begin operating within a certain time, and prosecute the same with reason-able diligence, or otherwise the contract could be declared void, and also gave lessee the right to drill other wells without let or hindrance if a dry hole was made in the first drilling, means that the contract when once vitalized by the commencement of a well within the stipulated time should remain in force for five years subject to forfeiture only by abandonment, or on notice for failure to drill the first well, and under the clause as to continuous drilling lessee, if engaged in drilling at the end of the five-year period, could extend the lease beyond that period only by continuously drilling until minerals in paying quantities were found and exhausted.

4. **Contracts** ⊚⇒161—**Entire contract considered in construing single clause.**

The entire contract should be considered in construing any clause thereof.

5. **Mines and minerals** ⊚⇒73½—**Mistake as to construction of continuous driling clause as affecting term one of law not available to lessor.**

Where lessee was to have certain land for five years from date and during the continuance of actual work or drilling, and for as long thereafter as oil or gas were found in paying quantities, error of lessor in construing the "continuous drilling" clause as meaning the lease should extend over the five-year period only in the event of continuous actual drilling through the five-year period by lessee was an error of law, and not of fact, and is not available to lessor.

6. **Mines and minerals** ⊚⇒81—**Secret construction placed by parties on clause in lease cannot bind others not parties thereto.**

A secret construction placed on a clause in an oil lease by lessor and lessee, and his attorney, could not be permitted to bind others not parties thereto, and having no knowledge thereof.

7. **Mines and minerals** ⊚⇒78(7)—**Remedy of cancellation of lease for abandonment held to be the only one remaining to a lessor.**

Where a lease provided that lessee was to have the premises for five years, and during continuance of actual work or drilling by said lessee or his assigns, and for as long thereafter as minerals were found in paying quantities, and it was stipulated that failure to begin and complete a well as provided by the contract should authorize lessor after notice to forfeit the lease, which option lessor never exercised, and no other express right of forfeiture being provided in the contract, none could be implied, and lessor was remitted to the remedies of specific performance, damages, or cancellation for abandonment, and, lessor not electing to sue for damages or specific performance, only the remedy of cancellation for abandonment remained.

8. **Mines and minerals** ⊚⇒77—**Court held warranted in instructing that facts conclusively negatived intention of lessees to abandon lease.**

In action to cancel an oil lease, wherein the only remedy for cancellation was through lessees' abandonment, it was *held*, under the

facts bearing on the issue of abandonment, that lessor was precluded as a matter of law from claiming lessees had abandoned the lease, and that the court was warranted in instructing the jury that the facts conclusively negatived any intention to do so.

9. **Mines and minerals** ☞77—As respects a claim of abandonment, held, that no benefit inured to lessor or lessees by reason of lessor's declaration in attempting without right to forfeit lease.

Where lessor had no right to declare a forfeiture, a declaration by him because of alleged noncompliance with the obligation to develop the land was futile for the purpose of forfeiting the lease, and no benefit inured to him by reason thereof as respects his right to claim abandonment, and neither is it available to lessees as an election forestalling lessor's right to make such claim, since they disregarded it, and proceeded to arrange for further operations.

Appeal from District Court, San Patricio County; M. A. Childers, Judge.

Action by John Stitz against the National Producing & Refining Company and others, to cancel an oil lease and for an injunction. From a judgment for defendants, plaintiff appeals. Affirmed.

A. J. Bell, of San Antonio, and V. H. Blocker, of Hondo, for appellant.

Kennon & Kennon, of San Antonio, for appellees.

SMITH, J. On March 20, 1919, Judge V. H. Blocker obtained from appellant, Stitz, an oil and gas lease upon 884.8 acres of land in McMullen county belonging to Stitz. No question is raised as to the sufficiency of the down consideration paid for the lease, nor is any fraud shown in its procurement from appellant by Blocker. In fact the latter was, and for a long time had been, and still appears to be, appellant's attorney and adviser, and apparently the lease was made over to him in order to facilitate the placing of it in the hands of some one who would undertake to develop the land for oil and gas purposes. Among others, these provisions were embraced in the contract:

"Lessee to have and to hold the said above-described land for five years from date, and during the continuance of actual work or drilling by said lessee, or his assignee, and for as long thereafter as oil or gas or coal or other minerals are found thereon in paying quantities.

"Lessee shall have the right to remove any machinery, or any other thing which he shall have put thereon, from the premises at any time without being liable to the lessors for damages.

"Lessee agrees to begin operating for drilling a well for oil or gas on the above-described land and to prosecute the same with reasonable diligence, unavoidable circumstances excepted, within ninety days from date, or this contract, upon notice in writing to the lessee, may be declared null and void.

"If a dry hole is made in the first drilling, it is agreed and understood that lessee can and shall have the right to begin and prosecute the drilling of other wells wherever selected by said lessee on said above-described land without let or hindrance by lessor under this contract."

On March 26th, six days later, Blocker assigned the lease to the Texas State Oil & Leasing Company, which began the drilling of a well on the land during the following December, under an agreement extending the time for that purpose, and drilled it to a depth of 700 feet by April 1, 1920, when the work was discontinued. On June 21, 1920, the last-named company assigned the lease to the National Producing & Refining Company, which resumed drilling in the same well about the 1st of the following October. When the well had been drilled to a depth of 900 feet, about January 1, 1921, salt water was struck, work was discontinued, the crew was discharged, and the company later sold the rig, although the derrick and other facilities used in the drilling were not disturbed. No other drilling operations were actually begun on the land.

On January 18, 1921, Stitz wrote the lessee, the National Producing & Refining Company, at Fort Worth, as follows:

"You will please appreciate my anxiety to know what steps your company intend to take, as to further developing or prospecting my land, since you have declared the present well is a water well, and have dismantled the rigging and machinery at the well, preparatory to a move elsewhere, I presume. Hence I am writing you to know whether you intend abandoning further work here or not, and if not, will you be kind enough to say about when work will begin again. I trust, you will see it to yours, as well as my interest, not to delay indefinitely nor too long, before developments are begun again."

To which the company, two days later, replied:

"Referring to your letter of the 18th, will say that our Mr. Harrison has already been instructed by the operating department to skid the derrick over preparatory to drilling another well to the shallow sand which was encountered in drilling the well which we recently completed in salt water. If we can find a shallow sand there, we shall certainly develop the field to the greatest extent possible. You may rest assured that our interests are mutual and I think we can develop the property as soon as any one else could do it, even if you had it back to lease to some one else now."

The correspondence thus initiated continued more or less regularly until shortly before this suit was filed, Stitz urging development, and the company still insisting upon its purpose and intention to resume operations at the earliest possible moment, but

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

postponing the beginning upon the stated grounds that the financial stringency was interfering, and that, besides, the low price of oil, and lack of pipe line facilities between the land and the railroads or market made it undesirable to all parties to bring the oil or gas to the surface until those conditions improved. On June 10th the company suggested in a letter to Stitz, who had threatened to cancel the lease, that, in order to avoid "difficulty or legal proceedings," it might be willing to pay a reasonable rental for deferring development until not later than the following March 1st, or that "we might be able to get in there in the next 30 or 60 days, or it might suit us better to make a small payment and defer it a little further on account of financial difficulties." On June 16th Stitz had prepared a 90-day extension contract, which he forwarded to the company through the bank, with $1,000 draft attached, but this was returned to him. Throughout this correspondence the company insisted that Stitz had no right to cancel the lease, and that it intended to proceed with development at the earliest possible moment, but on August 1st Stitz wrote it as follows:

"I am writing you in regards to the lease on my land. I have given you all the show and chance to do something and so far you have not done anything and will not even write what you intend to do. And now I declare the lease null and void as the contract has not been complied with. I expect you to send me a release on same at once."

To which the president of the company replied two days later:

"In answer to yours of August 1st, will say that financial conditions have been such that we did not deem it advisable to undertake further development on your lease at the present time, with the additional reasons as set out in my letter of some weeks ago. Now, Mr. Stitz, I do not know at the moment what our legal rights are in this matter, but I feel sure that the lease is a valid lease in our name, and if we have any rights you may rest assured that we will assert them to the fullest possible extent. If we have no rights, then we will be glad to execute a release to you. I will investigate the situation and let you know."

On September 22d Stitz wrote the company as follows:

"Have been waiting some time to hear from you in regards to the lease on my place. I have waited now for nearly ten months for you to do something, and nothing has been done yet, and now I must have a release at once. I will wait till 1st of October, 1921, for a release. If I do not receive by then I will bring suit for same. Hoping to receive this release without any further trouble, beg to remain."

And a week later the company replied:

"In answer to yours of the 22d, I am under the impression that active operations will be started on your property in the very near future. I am sure you would much rather have development than to bring suit for cancellation of the lease."

In the meantime, on August 20th, the company entered into a written contract with W. M. Stephenson, one of the appellees herein, by which it assigned to him a one-third interest in the lease, and under the terms of which Stephenson obligated himself to begin drilling a well on the land within 60 days, and prosecute the drilling thereof with reasonable diligence until oil or gas be found in paying quantities, and in pursuance thereof, on October 11th the president of the company wrote Stitz as follows:

"About a month ago, we contracted with Mr. Stephenson to drill a test well for you, but learned to-day from Mr. Stephenson that he had been on a long overland trip, visiting Mexico and Southwest Texas, and hence had not been able to begin the well for you as quickly as thought he would. He writes me that he has been over to your place for the purpose of seeing about water for drilling and a location for the well, etc. Mr. Stephenson says that you asked him what we were paying him for the drilling of the well, and that he had referred the matter to me. You readily understand that, when a concern is not in position to put the 'cash on the barrel head,' so to speak, that they must pay the price asked by the other fellow; therefore, the price which we must pay in order to get Mr. Stephenson to drill a well for you is out of the bounds of ordinary good business and we do not care to give out the price to any one, but we think so much of this lease and its future possibilities that we felt the deal we were making was justified under the circumstances. Furthermore, since Mr. Stephenson is interested in building a pipe line to San Antonio, we thought that getting him interested, so that you will have the advantage of selling your gas through his pipe line when completed, is a great advantage for you. I am sure that Mr. Stephenson will show you every courtesy in the matter of giving you information, because he speaks very highly to me about you. He says that you will do whatever you agree to do and that he is going to make a determined effort to get an oil well for you as quickly as possible. He is now ready to build a derrick and move drilling machinery on the land. I am giving a letter to Mr. Stephenson addressed to you giving him full authority to enter upon our lease and drill the well in accordance with our contract with him."

And again on the same date, October 11th:

"Having made a contract with Mr. W. M. Stephenson, of San Antonio, for the drilling of a test well on your land for oil and gas, this letter will be delivered to you by Mr. Donald Stephenson who has charge of the drilling operations in your vicinity and will superintend the drilling of the well on your land."

When Donald Stephenson, in pursuance of this authority, hauled the rig and other materials out to the land in controversy for the purpose of beginning operations, Stitz refused to permit him upon the land, or to

allow the material unloaded thereon. On October 14th Stitz brought this action to cancel the lease, and to enjoin appellees from going upon the leased premises for the purpose of developing the same, alleging that the lessees had failed to comply with the contract requiring them to drill upon the land, and had abandoned the lease. Much of the petition was stricken out on exceptions, but no complaint of that is made here, except in the first assignment of error, which relates to only a portion of the stricken pleadings.

[1] Appellant predicates his appeal upon six assignments of error, which will be considered in their order. The first assignment is best stated by quoting it:

"The court erred in sustaining defendant's exception to paragraph 13 of plaintiff's petition, to the effect that the said Stephenson had theretofore attempted to acquire this lease from plaintiff, that the said Stephenson knew at the time he took the pretended transfer of said lease from the National Producing & Refining Company that said lease had been by him canceled, and that the terms of said lease had not been complied with; that the plaintiff and said lessee were not on friendly terms, because under such conditions the fact that they were not on friendly terms would have been a circumstance to prove that the said Stephenson did not take said lease with an honest intention of developing plaintiff's land; that defendant Stephenson had leases upon a great deal of plaintiff's neighbors' lands which he had not developed, and that the landowners had derived no revenue therefrom, because plaintiff should have been permitted to show that defendant Stephenson had often tried to obtain said lease: that he had leases upon other adjoining lands in that neighborhood, which he had not developed, although he had held them for a number of years. All the facts alleged in paragraph 13 should have been permitted to have been proven upon the theory that defendant W. M. Stephenson did not acquire said lease with an honest intention of developing said land."

[2] We think these pleadings were properly excluded. The purpose of the suit was to cancel the lease, on the ground that the lessees had not complied with the conditions thereof, and to enjoin the lessees from further development thereunder. The excluded allegations had no conceivable bearing upon the merits of the case as thus laid. If the lease had been legally canceled before Stephenson purchased it, as alleged, then he obtained no rights by his purchase, and the stricken allegations were wholly immaterial and irrelevant, as averred in the exceptions thereto. If the lease contract was in force at the time of the assignment to him, then Stephenson succeeded to all the rights of his assignor, and the stricken allegations could have had no other effect upon the merits of the case than to prejudice the jury against those rights, as further averred in the exceptions to this pleading. The lease contract, by its own terms, was assignable without modification or restriction as to persons or purposes, and Stephenson's obligations as an assignee were determinable alone from the provisions of the contract, and not from his motives in purchasing the lease. Whether his motives were pure or were sinister, his obligations would be the same in either case, and were enforceable in the same degree. Moreover, it is not shown in appellant's brief, nor have we been able to ascertain from the record, that appellant excepted to the action of the court in striking out these pleadings, in which case, had there been error, it would be regarded as waived. The first assignment is overruled.

[3, 4] Appellant's second assignment of error is that—

"The court erred in his construction of said lease and by refusing to hear evidence upon any issue in the case, except that of abandonment. Because paragraph 7 of said lease provides that lessee shall have said land only upon condition that actual work or drilling is continuous."

Paragraph 7 of the contract, referred to in this assignment, is as follows:

"Lessee to have and to hold the said above-described land for five years from date, and during the continuance of actual work or drilling by said lessee or his assigns, and for as long thereafter as oil or gas or coal or other minerals are found thereon in paying quantities."

In his propositions under this assignment appellant contends that the clause in the quoted paragraph, "and during the continuance of actual work or drilling," had the effect of qualifying the provision that the lease should continue in force for five years, so that, if appellant ceased or suspended actual drilling at any time during the five years, the contract would ipso facto terminate. We do not think this clause is susceptible of such construction. The entire contract should be considered in construing any clause thereof, and, when that is done, the seventh paragraph can have no other meaning than that the contract, when once vitalized by the commencement of a well within the stipulated time, should remain in force for the period of five years, subject to forfeiture only by reason of abandonment, or, upon notice, for failure to prosecute to completion the drilling of the first well, and without prejudice to the lessor's right of action for specific performance or damages. Under the clause with reference to continuous drilling, the lessee, if engaged in drilling at the end of the five-year period, could project the lease beyond that period only by continuously drilling until minerals in paying quantities should be found and exhausted.

[5, 6] Appellant devotes much of his brief to the contention that the original lessee, Blocker, prepared the lease contract, and at the time of its execution advised appellant that the "continuous drilling" clause, which

had been accidentally copied from a copy of a contract left with him by Stephenson, it is alleged, meant that the lease should extend over the five-year period only in event of continuous actual drilling through that period, and that, if there was any cessation of actual drilling at any time during that period, the lease should by reason thereof terminate, and with this understanding appellant executed the lease as written; that as the parties to the lease so construed that clause, the courts should give it that construction, and, with a soft pedal, appellant in effect pleads actual or constructive fraud, whereby, because of this advice from Blocker, he was misled into executing the contract. The record shows, and it is urged in appellant's pleadings and briefs, that Blocker, the original lessee was appellant's confidential adviser and attorney and had been for many years at the time of these transactions, and, in fact, his name is signed to appellant's pleadings and briefs in this cause. It also appears that appellant was unable to procure a satisfactory lessee for his land, and that after consideration it was arranged between Blocker and himself that he should execute a lease of his land to Blocker, because the latter could handle it with more facility, and in this way the lease was executed to him. A few days later Blocker assigned the lease to the Texas State Oil & Leasing Company, and as a part of the consideration for the transfer appellant and Blocker each received $2,500 in the company's stock. Appellant testified:

"At the time I gave this lease to Mr. Blocker I didn't know whether he expected to perform this drilling; he had a right to transfer it if he wanted to. I expected him to transfer it. Mr. Blocker and I discussed that at the time. I don't know who he was to transfer it to. There wasn't any certain party mentioned. At the time I gave the lease, I expected Judge Blocker to transfer it, but I hadn't picked out any certain person to whom he was to transfer it. I executed this lease to my attorney, not with the expectation that he would perform the obligation of the lease himself, but expecting him to transfer the lease to anybody he could get to take it. It wasn't my purpose to let my attorney take the lease and sell it; it was to be developed. I had nobody in mind to whom he was to transfer it, who was to do the development. I expected my attorney to take this lease and to handle it some way for our mutual benefit."

There exist several reasons why this contention cannot avail appellant here. In the first place, the error in the construction of the "continuous drilling" clause is one of law, and not of fact. In the second place, a secret construction placed upon the clause by appellant and his attorney, agent, and trustee, for such Blocker was, should not be permitted to bind others not a party thereto, and having no knowledge thereof. Again it appears that the allegations setting up all these matters were stricken out by the trial court, and it does not appear that appellant excepted to this ruling in the court below, nor is it made the basis of any assignment of error urged here. The second assignment of error will be overruled.

[7] The third, fourth, and fifth assignments of error present the question of whether or not the issue of abandonment of the lease should have been submitted to the jury. This is really the only material question in the case as presented here. The record shows that the first well provided for in the contract was commenced and completed in accordance with the terms of the original and a supplemental agreement. It is true that work on this well was not begun within three months, as stipulated in the original contract, but it was begun within nine months, as provided for in the supplemental agreement. It is also true that there was a long hiatus during which this work was discontinued, but it was resumed, and the well completed without any complaint from appellant, who thereby waived his right to subsequently complain, and he does not in fact now complain, of those delays. It was expressly stipulated in the contract that a failure to begin and complete this well as provided in the contract would authorize appellant, after notice, to forfeit the lease; but appellant did not exercise this option, if it ever ripened. No other express right of forfeiture was provided for in the contract; none can be implied; and thus appellant was remitted to the remedies of specific performance, damages, or cancellation because of abandonment if the lessees failed in their obligations subsequent to the completion of the first well, which, for practical purposes, is deemed a "dry hole." Since appellant did not elect to sue for damages, or for specific performance, only the remedy of cancellation for abandonment remained in the case. Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464.

[8] We have set out the salient facts bearing upon this issue, and have concluded that, under those facts, which were put in issue by appellant himself, he is precluded as a matter of law from claiming that appellee abandoned the lease. The issue of abandonment is determinable from the intention of the parties charged with the act of abandonment, and such intention is to be ascertained from all the facts and circumstances surrounding the transaction. In this case the delay in beginning a new well, the removal of part of the drilling paraphernalia, and the discharge of the men employed in drilling the first well, if unexplained by the lessees, and if these facts stood alone, would warrant a finding of abandonment. But these facts do not stand alone. They were very fully and reasonably explained by testimony which appellant himself put in evidence. Appellant was in constant communication with the

lessees, who all along insisted upon a fixed purpose to hold the lease, and resume operations, and whose explanations of the delay were entirely reasonable and consistent with their expressed purpose. They left the derrick and other material on the land, for the expressed purpose of testing out a shallow oil stratum which had been developed in the first well; they sent representatives on at least two occasions to go over the ground with the view of further development, and to assure appellant of their intention to resume operations, and, when threatened by appellant with a legal controversy over the delay, they offered to pay him rentals covering the time of further necessary delays in order to avoid such controversy and mollify appellant. And finally, in August following the cessation of actual operations on January 1st, they assigned a two-thirds interest in the lease to Stephenson in order to procure the prompt resumption of these operations. But when Stephenson, in pursuance of his agreement to drill, undertook to place the necessary material on the ground, and begin drilling, appellant himself prevented him from doing so. The fact that this effort to resume operations occurred about the time of, or even a few days subsequent to, the filing of suit does not affect the question of intention, since the act was done in pursuance of a contract made by the lessees some two months before the suit was instituted. These facts conclusively negative any intention of the lessees to abandon their lease, and the court was warranted in so instructing the jury.

[9] Both parties lay much stress upon the act of appellant in writing appellee, on August 1st declaring the lease forfeited because of the latter's alleged noncompliance with his obligation to develop, appellant contending that this act put an end to the lease, and appellees contending that it was an election by appellant to forfeit on account of breach of covenant, thus forestalling any right to claim abandonment. As we have shown, appellant at that time had no right to declare a forfeiture, and hence his declaration was futile for that purpose, and no benefit inured to him by reason of it. Nor do we think it available to the lessees for the purpose claimed by them, since they disregarded it, and proceeded to arrange for further operations under the lease in spite of it. If by reason of this declaration appellees were deterred from pursuing their purpose to develop, then, of course, appellant could not be heard to complain of the resulting inaction. McCallister v. Texas Co. (Tex. Civ. App.) 223 S. W. 859. Appellant's third, fourth, and fifth assignments of error, for the reasons given, are overruled, and the sixth assignment, becoming immaterial, is also overruled.

We think the cause was fairly tried and properly disposed of in the court below, and, as no reversible error is presented, the judgment will be affirmed.

Affirmed.