HUMBLE OIL & REFINING CO. v. RECLA-
MATION CO.

No. 12767.

Court of Civil Appeals of Texas. Fort
Worth.

Jan. 28, 1933.

Rehearing Denied March 11, 1933.

R.. M. Rowland, of Fort Worth, and R. E.
Seagler, of Houston, for appellant.

Thompson & Barwise and Ogden Shannon,
all of Fort Worth, for appellee.

LATTIMORE, Justice.

Prior to June 13, 1925, appellee had been.
running its gas containing casinghead gaso-
line to the plant which appellant had bought
before that date, and on said date appellee
contracted to run all its gas from its well to
appellant during the life of the well. The per-
tinent clauses of the contract are:

"V. Humble Oil & Refining Company con-
tracts and agrees, at reasonable intervals,
and at least once every ninety days, at the re-
quest of The Reclamation Company, to make
physical tests of the casinghead gas collect-
ed and gathered by it from The Reclamation
Company's well upon said lease; said test to
be made by the charcoal absorption process
or method, and at and upon The Reclamation
Company's lease from gas coming directly
from The Reclamation Company's said well
and at the gathering system to which said
gas shall pass for the purpose of determining
with reasonable accuracy the amount of mar-
ketable gasoline contained in said casinghead
gas, and in making and conducting said test
no allowance or deduction shall be charged
against The Reclamation Company for any
air that may become mixed with said gas aft-
er same comes from the said well and passes
into the gathering system hereinbefore men-
tioned.

"VI. Humble Oil & Refining Company agrees to pay The Reclamation Company and The Reclamation Company agrees to accept in full payment for the amount of gas delivered by it to Humble Oil & Refining Company each month, compensation to be determined upon the following basis:

"(a) The gasoline content of said casinghead gas shall first be determined by physical tests as hereinbefore provided for:

"(b) There shall next be ascertained from the daily meter readings the total amount of casinghead gas that passes through said meter, located upon said Reclamation Company's lease, as hereinbefore provided for.

"(c) Based upon the gasoline content contained in said gas, ascertained by physical tests, as above provided for, and the total amount of casinghead gas that passes through said meter, as hereinbefore provided for, there then shall be determined the total amount of gasoline contained in the total amount of gas passing through said meter for said month.

"(d) Of the total amount of gasoline so determined as being contained in the total amount of gas passing through said meter for said month, The Reclamation Company shall be entitled at its option, from time to time, to be exercised whenever and as often as it sees fit, to receive 1/4 of the total amount of said gasoline so contained in said total amount of gas passing through said meter; or to receive in full payment for its said 1/4 of said gasoline, adjustment on the basis of the average price per gallon of gasoline received by Humble Oil & Refining Company from sales of gasoline during said month; said average sale price per gallon to be f. o. b. Breckenridge; The Reclamation Company not to be charged with any evaporation or temperature corrections or losses due to weathering operations or other deductions of a similar character.

"(e) The following facts are assumed only as a basis to serve as an illustration of the method of making adjustment for the gas sold by The Reclamation Company to Humble Oil & Refining Company.

"1. Assuming physical tests of the gas, conducted in the manner hereinbefore set out, developed a gasoline content of 2 gallons per 1000 cubic feet, and that the meter readings from the meter on the lease show that 40,000,-000 cubic feet of gas passes through said meter (no deductions being taken for air contents as above set forth.)

"2. Assuming that the average price per gallon received by Humble Oil & Refining Company from sales of gasoline during the month f. o. b. Breckenridge is 10 cents per gallon.

"3. Then the basis of adjustment and payment by Humble Oil & Refining Company to The Reclamation Company, in the event it did not elect to take its 1/4 of the gasoline itself, would be as follows:

"40,000,000 cubic feet x 2 gallon per 1000 produces 80,000 gallons of gasoline.

"The Reclamation Company would be entitled to receive 1/4 of this 80,000 gallons of gasoline, which would amount to 20,000 gallons of gasoline. The sale price being 10 cents per gallon The Reclamation Company for its 20,000 gallons of gasoline would be entitled to receive, and the Humble Oil & Refining Company would be obligated to pay the sum of $2000.00.

"In the event The Reclamation Company elects to have the Humble Oil & Refining Company make payment to it in cash for its portion of said gasoline, based upon the average market price per gallon f. o. b. Breckenridge, received by Humble Oil & Refining Company during said month, Humble Oil & Refining Company agrees that during a period of 12 months the average price per gallon of gasoline received by it, and upon which it will make adjustment to The Reclamation Company will equal the average market price per gallon of gasoline of similar quality as established and reflected in the National Petroleum News or any other standard oil publications, quoting casinghead gasoline prices, and in the event the price of Humble Oil & Refining Company does not equal the average market price per gallon of gasoline of similar quality as established in the National Petroleum News or any other standard oil publications, the Humble Oil & Refining Company agrees and obligates itself to make adjustment at the end of each twelve months to The Reclamation Company for the difference of the gasoline purchased from the Reclamation Company reflected between the average market prices received by the Humble Oil & Refining Company per gallon and the average market price as reflected by said oil and gas publications.

"IX (a). Concerning the option granted to The Reclamation Company, as set forth in Paragraph 6, subdivision (d) herein, it is stipulated that The Reclamation Company will elect to take either money or gasoline in settlement, on a yearly basis; and that notice of such election will be given by The Reclamation Company in advance."

The appellee elected to receive money instead of gasoline on quality and value.

Casinghead gasoline grades from A down through AA and B to C, the lowest. The testimony, while not very convincing, is sufficient to support the trial court's finding that appellee's well at all times produced grade A gasoline. The gas from the various wells connected with appellant's plant was mixed and thereafter the gasoline extracted from the mixture and the test for quality was made after such gasoline was placed in the tank car. Appellant paid appellee for grade A gas-

oline the first four months under this contract and thereafter until March, 1930, for lower grades, which were shown to be the actual grades in the tank cars. Appellee accepted the first payment for lower grades without protest, but thereafter protested each payment on the ground that its well was producing grade A gasoline and that it was therefore entitled to pay on grade A prices.

The trial court rendered judgment for appellee for the difference in value for grade A gasoline and that grade actually paid for by appellant, as evidenced by its test for quality on the united product of all its purchases of gas from appellee and other producers. Appellant claims such judgment is in plain violation of the contract.

■ Both parties contend in their briefs that this court should adopt the interpretations of the contract placed thereon by the parties (though they differ in this case as to what that interpretation was). This rule has application though the contract is not ambiguous. San Jacinto Oil Co. v. Fort Worth Power & Light Co., 41 Tex. Civ. App. 293, 93 S. W. 173; Dublin Electric Co. v. Thompson (Tex. Civ. App.) 166 S. W. 113. Counsel for appellant several times reiterates in italics that appellee "is entitled to pay only for the kind of gasoline which it would have gotten if it had accepted the gasoline itself."

It is to us quite plain that that portion of the contract which gave the option to appellee to receive gasoline in payment for its sale to appellant conferred the right on appellee to receive one-fourth of the identical gasoline extracted from the gas from appellee's well. The contract so provides when it recites that the appellee shall be entitled to receive one-fourth of the total amount of "said gasoline" passing through the meter on appellee's well. Also VI, e(3), of the contract recites that if appellee "did not elect to take its 1/4 of the gasoline itself," and again, "The Reclamation Company would be entitled to receive 1/4 of this 80,000 gallons of gasoline." It thus follows that appellant's theory necessitates our holding that payment is on the value of the gasoline produced from appellee's well. Where parties have presented a case on an agreed theory this court should accept such theory in passing on the appeal. Wolff & Co. v. Missouri, K. & T. Ry. (Tex. Com. App.) 289 S. W. 1000.

The trial court has found on sufficient evidence that the parties understood in making the contract that appellee's gasoline was to be mixed at the plant with that from other wells but this is not inconsistent with our reading of the contract, for plainly if the appellee received a gasoline of equal value (i. e., of equal quantity and quality) to that run from its well, the payment is in full, for gasoline is produced by both appellee and appellant to sell. You cannot eat it or decorate

with it. Indeed, our belief about this opinion is supported by section 6, subd. A, of the contract which requires such option to be exercised on an annual basis, thus indicating that appellant realized that tests would have to be made and other different procedure adopted to preserve for appellee its gasoline in case of the exercise of option (a).

We do not find any want of clearness which may be properly called an ambiguity in the contract, but this does not eliminate the application of the rule that where the parties intended in making the contract it should have a certain meaning or have themselves agreed that it bound them in a certain manner and have acted thereon, the court will adopt that meaning. San Jacinto Oil Co. v. Fort Worth Power & Light Co., supra.

We believe the evidence insufficient to support the finding of the learned trial court that "100% efficiency" was intended to refer to quality of recovery. The testimony clearly shows that when appellant agreed to that provision (VIII(d) as providing for 100 per cent. efficiency all parties understood that it had reference to measuring recovery at the well instead of after separation at the casinghead plant of appellant, i. e., as eliminating the loss from evaporation during handling.

■ Moreover, if we are mistaken in the above affirmance, the contract carries the implied warranty that the appellant will proceed with such skill as the average person engaged in such business with the equipment it had to recover the most profitable quality of gasoline obtainable acting in good faith to itself and to appellee. Freeport Sulphur Co. v. Royalty Co., 117 Tex. 439, 6 S.W.(2d) 1039, 60 A. L. R. 890; Metropolitan Casualty Co. v. Medina (Tex. Civ. App.) 53 S.W.(2d) 1026.

■ The findings of fact of the trial court fail to cover the situation in that same find that appellant could have "by the installation of proper machinery" recovered grade A gasoline. Appellee had been running the gas to this plant long prior to the time appellant purchased it, and knew the facilities that appellant had for quality recovery when the contract was signed and the court cannot imply an agreement to improve the machinery equipment by new purchases when the parties did not see fit to so require. Only those covenants are implied which are so clearly a part of the contract as that the court can say that the parties considered them so without the necessity of writing them into it, or a necessity to carry out the expressed agreements of the contract. Freeport Sulphur Co. v. Royalty Co., supra. However, when appellant did install such machinery as the evidence shows it did by building a "skimming plant" through which its entire casinghead gasoline receipts could be made grade A, the appellee was entitled to the benefits of same and appellant was not entitled to make grade

A part of the time and refuse to "skim" the gasoline output the remainder of the time, and thereupon turn out lower grades of gasoline, and adjust with appellee on such basis. Unfortunately, the evidence is not developed to the point that we can decide what portion of the gasoline that could have been "skimmed" was not thus treated.

As regards the statute of limitation, it is apparent from what is above said that the suit is on the written contract and therefore the four-year statute of limitation (Rev. St. 1925, art. 5527) applies.

The judgment is affirmed.