## ROBERT et al. v. SWANSON et al.
### No. 2742.

Court of Civil Appeals of Texas. Eastland.
July 25, 1949.

Rehearing Denied Sept. 9, 1949.

Harrell & Harrell, Breckenridge, Grisham & King, Abilene, Moody Pearson, Houston, for appellants.

Joe E. Childers, Abilene, for appellees.

PER CURIAM.

On October 15, 1938, Stonewall Oil Company owned oil and gas leases on land in Stonewall County. On that date it executed to A. G. Swanson, in payment for Swanson's services in assembling said block of leases, an oil payment agreement, the portion here material being as follows:

"Stonewall Oil Company, a corporation, does hereby sell, assign, transfer and convey unto A. G. Swanson, an undivided one-sixteenth (1/16th) of the seven-eighths (7/8) working interest oil produced, saved and sold from the above described property, until the said A. G. Swanson shall have received the total aggregate sum of Ninety Thousand Dollars ($90,000.00) in money, payable solely from oil when, as and if produced, saved and sold from said above described property from and after seven o'clock A.M. November 1, 1938; the intent of this conveyance being that said grantee herein shall receive said undivided one-sixteenth (1/16) of the 7/8 working interest oil when, as and if produced, saved and sold from the above described

property to be delivered to said grantee herein free and clear of all cost and expense of whatsoever kind and nature at the pipe line to which said lessee, its successors and assigns, shall connect the well, wells, tanks or other delivery point, or to whom lessee may sell the same at the well, wells, tanks or other delivery point, until said grantee shall have received Ninety Thousand Dollars ($90,000.00) in money, when all rights hereunder of the grantee shall cease and terminate."

On September 1, 1942, Jack B. Robert purchased the oil and gas leases subject to Swanson's oil payment contract.

After execution of the oil payment agreement in 1938 and before Robert acquired the leases in 1942, oil was produced on some of said leases and the oil was hauled from the lease to the Stamford Refining Company at Stamford, about 60 miles distant, and there sold to the Stamford Refining Company. Thereafter, oil was transported from the leases to Onyx and Moutray refineries near Abilene. In each instance Swanson and Shoults, the latter having purchased a one-third interest in Swanson's contract, paid for the transportation of their oil. Oil from these leases was being transported to Moutray refinery when Robert acquired the leases. He said he then knew of the prior division orders wherein Swanson and Shoults agreed for the refinery to deduct from their payments the cost of hauling their oil. The record, however, does not show any dealings between Robert and Swanson and Shoults prior to Robert's purchase of the leases.

On June 14, 1943, Robert wrote Swanson and Shoults as follows:

"We are enclosing division order for you to sign to the Humble Oil and Refining Company. We feel it is a much better deal for us and a more permanent deal for you than selling oil to the Moutray. Under this arrangement, we will pay you not less than eighty-one cents (81¢) a barrel, *based on 40 gravity* and take title at the well based on our sale to the Humble and remit to you as your interest appears in the title just as soon as we receive check from the Humble. We will

attempt to get an approval for an increase of four cents (4¢) per barrel from the Office of Price Administration (which Stonewall County does not have as yet), and give you the benefit of the increased price *and we will give you the benefit of any other increase posted by the Humble in this vicinity.* We to deduct gross production and pipe line tax before remitting to you. Either you or us can discontinue this arrangement by giving a ninety day written notice sent by registered mail to the other party."

This proposal was accepted as of June 14, 1943 by Swanson and Shoults. Mr. Swanson testified that he refused to sign said letter for about 60 days but did sign it when Mr. Robert wrote into the letter with a pen the words underscored above. The division order enclosed in Robert's letter quoted above was executed by both Swanson and Shoults and oil from the leases in question was sold to Humble under said order. This division order recited that the oil was being run "from storage erected and maintained by J. B. Robert adjacent to Humble Pipe Line Company's Hamlin Station." It directed Humble to make payment for all of the oil to Robert. Said division order contained the further provisions:

"* * * said Company agrees to receive and pay for such oil according to the division of interest hereinabove indicated at the price per barrel (42 gallons) of $1.21 per barrel for crude oil of 40 degree gravity and above, with a $0.02 decrease in price for each degree decrease in gravity to $0.91 per barrel for crude oil of 25 degree gravity and below. Settlements and payments to be made monthly by check of Humble Oil & Refining Company mailed to the party above indicated at the address given.

"The foregoing will be considered to be the well price for the oil delivered hereunder, and Jack B. Robert will settle with the royalty holders on the basis of that price. An additional allowance of 10¢ per barrel for the oil delivered at Hamlin Station over and above the price stated in the preceding paragraph will be paid to

Jack B. Robert, inasmuch as he will gather the oil and will transport it and effect delivery to Humble Pipe Line Company at its Hamlin Station, 10¢ per barrel being equivalent to the normal pipe line gathering tariffs in this area."

The order concludes that the signers, including Swanson and Shoults, authorized payment to Robert for all of the oil, and Swanson and Shoults expressly released Humble from any liability by reason of making payment to Robert under said order. Mr. Swanson testified that on August 23, 1943, he mailed the following letter to Mr. Robert:

"Regarding the letter contract or Division Order signed by the royalty owners, which allows you 40¢ per bbl. for hauling 40 miles—is entirely out of line. I am sure we can get this hauled by a reliable contractor for 18¢ per barrel.

"Since all royalty owners did not sign the same form of letter contract, and further since said contract is unilateral as to the cancellation clause, this is your notice of cancellation of said contract by the writer. It looks like you intend to run over the mineral owners rough-shod, at least I will be in the same position as other mineral owners—able to make a contract on our interest at any time we see fit.

In June, 1947, Swanson wrote Humble that Robert had not paid him for his interest in the oil since April 1, 1947 and Swanson requested Humble to prepare a division order so that he would be paid directly by Humble for his share of the oil. Thereafter, Swanson wrote many letters to Humble requesting the preparation of a new division order, always assigning as the reason that Robert had not paid him for his interest in the oil since April 1, 1947.

Notwithstanding Mr. Swanson's letter of August 23, 1943, which he relies upon as a cancellation of his contract with Mr. Robert, in which Swanson interpreted their contract of June 14, 1943 to mean that Robert was to get 40 cents per barrel for hauling Swanson's oil, Swanson admits that he accepted the checks from Robert for his part of the oil with 40 cents per

barrel deducted for hauling up to April 1, 1947, at which time he refused to continue to accept said checks. Shoults, who had acquired one-third of Swanson's oil payment, continued to accept and cash Robert's checks under the same condition until April 1, 1948. Although Swanson testified he never agreed to pay anything for the transportation of his oil from the lease to Robert's storage at the Humble Station at Hamlin, about 40 miles away, his written contract under which he acted for about four years and his letter dated August 23, 1943, shows he did agree to pay therefor. Except for said testimony the record indicates that the sole ground for complaint prior to the trial was as to the amount Robert was charging for transportation, rather than the fact that he was charging for transporting Swanson and Shoults' oil. In other words, outside of Mr. Swanson's said testimony, the record indicates that the complaint of Swanson and Shoults prior to the trial of the case was that Robert's charge of 40 cents per barrel was excessive. In Swanson's letter to Robert in August, 1943, upon which he depends for cancellation of his June, 1943 contract, he interprets said contract as meaning, as it plainly does, that he has agreed to pay Robert 40 cents per barrel for hauling his oil. His complaint was that 40 cents per barrel was too high. The contract and division order of June 14, 1943 executed by Swanson and Shoults, clearly authorized Robert's charge for hauling.

Swanson and Shoults sued Robert and Humble Oil & Refining Company for the unpaid balance of the gross purchase price of their oil sold by Robert to Humble. Their petition alleged that the 40 cents a barrel withheld by Robert for hauling their oil was an unauthorized deduction. Robert answered that he was not under any obligation to transport Swanson and Shoults oil without charge to a distant pipe line; that there had never been a pipe line connected with the lease but the nearest pipe line was 40 miles from the lease. He alleged the execution of the letter contract between Robert and Swanson and Shoults on June 14, 1943 and their execution of the Humble division order, which au

thorized Humble to account to Robert for 100% of the oil produced from the lease. Robert alleged that it was thereby agreed that he should pay Swanson and Shoults 40 cents per barrel less than the purchase price and that said contract provided that either party could cancel it by giving 90 days written notice by registered mail, but that such notice had not been given. Robert alleged that pursuant to said contract he accepted delivery of the oil belonging to Swanson and Shoults at the well, transported it to Hamlin and delivered it to Humble who accounted to him for 100% of the proceeds until April 1, 1948, in accord with the division order signed by Swanson and Shoults. Robert's letter and the division order clearly show that Robert was to pay Swanson and Shoults 40 cents per barrel less than he was to receive from Humble. All parties hereto clearly interpreted the June 14, 1943 agreement to mean that Robert was to get 40 cents per barrel for transporting their oil and they acted accordingly and acquiesced in such interpretation for about four years. Robert alleged that he accounted to Swanson until March 1, 1948 and to Shoults up to May 1, 1948; that payments for his oil with 40 cents per barrel deducted for hauling had been accepted by Swanson until May 1, 1947 and by Shoults until May 1, 1948; that he was ready, able and willing to pay them for their oil sold after said dates in accord with the provisions of their contract of June 14, 1943 as soon as the runs were released to him by Humble. Payment for the runs after said dates had been held up by Humble on the demand of Swanson and Shoults. Robert tendered the full amount due them under the terms of said written contract. He alleged in detail the hauling and sale of oil to the different refineries heretofore mentioned; that Swanson and Shoults were estopped to claim he was obligated under the terms of the oil payment contract to deliver Swanson and Shoults oil free of charge to a purchaser or pipe line 40 miles from the lease because of their long acquiescence in an interpretation to the effect that Swanson and Shoults were obligated to pay the cost of transporting their oil from the lease to the Hamlin refinery.

Robert alleged that before the institution of this suit there arose a controversy between the parties as to the charges for transporting Swanson and Shoults oil from the lease to a purchaser and that there was then an agreement that 40 cents a barrel was a reasonable charge for transporting their oil and such charges would be paid to Robert; that Robert had paid, or tendered, to Swanson and Shoults each month the amount due for their oil under said agreement which payments had been accepted by them in full satisfaction and discharge of the cause of action, and that such tenders constituted an accord and satisfaction of the cause of action asserted by Swanson and Shoults.

Robert further alleged that he had continued to transport Swanson and Shoults oil to the Humble refinery at Hamlin after the filing of the suit and that Humble had charged back to him the proceeds of the royalty oil belonging to Swanson since April 1, 1947, and Shoults since April 30, 1948. He asserted that if the court should order such funds paid directly to Swanson and Shoults by Humble the order should provide that 40 cents per barrel be deducted for the transportation of their oil by him to the Humble refinery.

Upon a trial to the court, judgment was rendered that Swanson recover nothing for oil produced and sold under the oil payment obligation prior to April 1, 1947, but that Swanson should recover $1,633.62 for the oil produced and sold under said contract for the period commencing April 1, 1947 and ending August 31, 1948; that Shoults should recover nothing for the oil produced and sold under said contract prior to April 30, 1948, but that Shoults should recover $212.97 for the oil produced and sold under the oil payment contract after May 1, 1948 and through August 31, 1948. The court further found that Robert was not entitled to anything from Swanson or Shoults for transporting their share of the oil from the lease to the Hamlin station after the dates they quit cashing his checks

for their share of the oil with 40 cents per barrel deducted for hauling.

All parties excepted and gave notice of appeal but only Robert and Humble Oil & Refining Company have perfected their appeal.

The court filed findings of fact and conclusions of law, including the following: That the oil payment obligation executed by Stonewall Oil Company to Swanson in 1938 was in effect when Robert acquired the leases and Robert took same subject to the oil payment contract and was bound by its provisions. Finding 5 was to the effect that Swanson and Shoults, by reason of the provisions of the oil payment contract, were entitled to the gross sum paid by Humble to Robert for Swanson and Shoults' part of the oil. The court construed said oil payment contract to mean that Robert was required to transport Swanson and Shoults oil free to the place where it was delivered to a purchaser. The court further found (7) that the letter contract and division order dated June 14, 1943, whereby Swanson and Shoults agreed that Robert should be paid 40 cents per barrel for transporting their oil to Hamlin, had been cancelled in the manner provided for in that contract. The court found (8) that there was a controversy between said parties concerning the manner in which Robert was making payment to Swanson and Shoults under the oil payment contract but that Swanson and Shoults accepted his checks with hauling charges deducted through March 31, 1947 and April 1, 1948, respectively. The court further found that Humble was a stakeholder and not liable except for the payments withheld by it on the demand of Swanson and Shoults. The court found that Swanson did not agree to pay Robert for hauling his oil to Hamlin from March 31, 1947 through August 31, 1948 and that Shoults did not agree to pay Robert for transporting his oil from April 30, 1948 through August 31, 1948. The trial court concluded as a matter of law: That Robert was not entitled to pay for transporting Swanson and Shoults oil; that Swanson was not entitled to recover the charges for hauling his oil prior to April 1, 1947 and that

Shoults was not entitled to recover said charges made prior to May 1, 1948. Said findings were evidently based on the fact that Swanson and Shoults had received and cashed Robert's checks up to said dates with the hauling charges deducted.

■ We think the trial court correctly interpreted the oil payment contract, that is, that it means that the lessee is obligated to deliver Swanson's oil to Swanson, or to a purchaser from Robert, free from all charges. It provides that Swanson is to receive $90,000.00 in money out of his share of the oil when produced and sold. It expressly provides that Swanson's oil is to be delivered to him "free and clear of all costs and expense of whatsoever kind and nature." The place where his oil is to be delivered to him free of expense of every kind is stated to be at the pipe line to which the lessee, or his assign, shall connect the wells or tanks "or other delivery point." The wells and tanks were never connected with a pipe line. This statement is followed by the provision "or to whom lessee may sell the same at the well, wells, tanks or other delivery point." We think the last quoted provision means that Swanson's oil is to be delivered to a purchaser from the lessee free of cost. Here the place is stipulated to be at the wells or tanks "or other delivery point." The latter provision makes no reference to a pipe line. We conclude that it was intended that Swanson's oil was to be delivered by the lessee, or his assign, to Swanson or the purchaser free of expense. Appellants argue that delivering Swanson's oil to a pipe line on the lease or to a distant refinery are such vastly different things that if it had been intended for the lessee to deliver Swanson's oil free of expense at a distant refinery it would have been so expressly stipulated in the contract. When the parties to the oil payment contract provided that it was to be delivered to the grantee, or the purchaser from the lessee, "free and clear of all cost and expense of whatsoever kind and nature" until Swanson received $90,000.00 in money, we think it was made plain that it was not contemplated that Swanson was to pay any expense and that he was to actually receive

$90,000.00 "in money," to be defeated only by the failure of the wells to produce that much to his part. If the parties had intended for Swanson to pay the expense of hauling his oil to the place where it was delivered to Swanson or a purchaser, instead of providing that his oil was to be delivered to Swanson or a purchaser from the lessee free of all cost and expense of every kind and nature and exception to such provision, applicable only to the expense of hauling it to market, could have been easily inserted. To insert into this agreement that the expense of delivery of Swanson's oil was to be paid by him would be to write into the contract an agreement contrary to its express provision that Swanson's oil was to be delivered free of "all cost and expense of whatsoever kind and nature."

■ It is difficult to understand some of the other findings and conclusions. The effect of the judgment was to require Swanson and Shoults to pay Robert 40 cents per barrel for transporting their oil during the time they cashed the checks given them by Robert, in which checks the 40 cents per barrel for hauling was deducted. Under the trial court's interpretation, and our interpretation, of the oil payment contract if Swanson and Shoults' oil was delivered to the purchaser at Hamlin, it was Robert's duty to deliver it there to the purchaser free of expense to Swanson and Shoults. In the absence of an estoppel, which we do not find in this case, or of a contract based on a valuable consideration changing the effect of the oil payment contract Swanson and Shoults would not be prevented, merely by the acceptance of a part of the money due them, from recovering the unpaid balance from Robert. But Swanson and Shoults agreed that Robert should take title to all of the oil at the well and pay Swanson and Shoults 81 cents per barrel for their oil for which he was receiving, with their knowledge, $1.21 per barrel 40 miles away at the Hamlin refinery. Robert went to considerable expense, erected a tank near Humble's Hamlin refinery, bought an oil truck and hired a driver and made a contract with Humble that they were to receive the oil from Robert's tank near their refinery when and as he accumulated more than 1,000 barrels at a time.

The oil payment contract did not require that Robert deliver Swanson's oil at Hamlin or any other specified point. Since there was no pipe line connection, it only required that Robert deliver Swanson's oil to him or to a purchaser, free of cost, at the wells, tanks or other delivery point. Of course, this required the exercise of good faith in fixing the delivery point. But the oil payment contract did not require that Hamlin be the delivery point. It did not necessarily require that Robert erect the tank at Hamlin, buy a truck and employ a driver, all of which he did. The contract of June 14, 1943 was valid and enforceable.

■ The contract of June 14, 1943 was not cancelled by Swanson in the manner provided in said contract. Shoults made no attempt to so cancel it. After Swanson's alleged cancellation in August, 1943, he continued to knowingly receive and cash Robert's check for his oil, with 40 cents per barrel deducted for hauling, until April 1, 1947, and Shoults cashed them until April 30, 1948. It is evident that the contract of June 14, 1943, authorizing Robert to withhold 40 cents per barrel for hauling their oil, was not cancelled and is still in force. Of course, it can be cancelled by giving the notice for the time and in the manner agreed upon.

The judgment is reversed and judgment rendered that Swanson and Shoults recover nothing from Robert and that Humble Oil & Refining Company account to Swanson and Shoults for their share of the oil impounded, less 40 cents per barrel to be paid to Robert for hauling it.

The judgment is reversed and judgment rendered for appellants.