John K. SKAGGS, Plaintiff,

v.

Georgia HEARD, a widow, and R. M. Sikes, Defendants.

Civ. A. 1636.

United States District Court
S. D. Texas,
Corpus Christi Division.

March 4, 1959.

John D. Hyde, Gilbert J. McGloin, Corpus Christi, Tex., for plaintiff.

Boone, Davis, Cox & Hale, Allen V. Davis, Charles L. Hale, Jr., Corpus Christi, Tex., for defendant Georgia Heard.

J. R. Sorrell, Corpus Christi, Tex., for defendant R. M. Sikes.

ALLRED, District Judge.

This is an action by the owner of the working interest in an oil and gas lease against the original lessor and an overriding royalty owner to recover a proportionate part of the cost of operating a compressor unit necessary to deliver gas from two producing wells into the purchaser's pipe line *on the lease,* 330 feet from the wells. Defendants move for summary judgment based on the pleadings, admissions and stipulations.

Plaintiff is a resident citizen of Kentucky. Defendants are resident citizens of Texas. The amount in controversy exceeded $3,000, sufficient to sustain jurisdiction in diversity cases when the action was filed, August 21, 1957.[1]

---

1. Prior to the passage of Public Law 85.-554, H.R. 11102, effective July 25, 1958, 28 U.S.C.A. §§ 1331, 1332, which raised the jurisdictional amount to $10,000 exclusive of interest and costs.

The original oil and gas lease, covering 25 acres, was executed August 22, 1953, by defendant Heard, in favor of M. R. Kelley and others (hereafter called Kelley). A one-fourth lessor's royalty was reserved in the lease by Mrs. Heard. On October 2, 1953, Kelley assigned a 1/16th of 5/8ths overriding royalty interest to defendant Sikes.

On October 20, 1953, Kelley entered into a sales contract with Industrial Gas Supply Corporation and Ship Channel Industrial Gas Corporation (hereafter called Industrial), whereby Kelley sold, and Industrial purchased, all the gas to be produced from the leased premises. Two gas wells were completed by Kelley in November 1953, at which time "the reservoir pressure * * * was sufficient to enable the gas to buck the line of the purchaser, Industrial * * * without artifically increasing the gas pressure by means of a compressor. At that time gas was sold at the outlet side of the ordinary field separator installed on the lease by Kelley * * *. Approximately 15 months thereafter, reservoir pressures either declined, or the purchaser's pipeline pressure was increased, or a combination of both, to the point at which compression was necessary to force the gas into Industrial's line * * * so that it can be transported to the ultimate users or consumers * * *. The reservoir pressure now is such that not one cubic foot of gas will enter Industrial's line without first having its pressure increased in plaintiff's compressor unit." [2]

Kelley therefore installed a compressor unit on the lease about January 1, 1955 and began compressing gas from the wells into Industrial's pipe line *on the lease*. As the gas is produced from each well it passed through a meter measuring production from the wells and then through a separator before reaching the *compressor unit*. After passing through the compressor the gas flows through Industrial's meter and then into Industrial's pipe line. The separator is located approximately 320 feet and the compressor unit approximately 330 feet from the wells; and the point at which the gas passes into Industrial's pipe line is only a few feet from the compressor. *All the installations,* including the point of entrance into Industrial's pipe line, *are located on the premises*.

After installation of the compressor Kelley operated the lease for about 11 months. He made *no attempt before, during or after* that time to impose a charge on defendants for a proportionate part of the cost and operation of the compressor.

Under date of December 28, 1955,[3] Kelley assigned the lease to plaintiff Skaggs, reserving a production payment.[4] Plaintiff paid $29,000 for the lease and equipment, *including the compressor unit*. Plaintiff has operated the lease since that time. He claims that the compressor had a value of $12,000 when he took over the lease; and that the expense of operating the lease is approximately $400 per month, 90% of which is attributable to operation and maintenance of the compressor.

On May 3, 1954, while Kelley Brothers were operating the lease and before installation of the compressor, they, together with defendants, executed a division order, addressed to Industrial, reflecting that Kelley owned .6875000 working interest, Sikes .0625000 overriding royalty and Heard .2500000 royalty. The division order directed payment in accordance with the foregoing division of interest and authorized Industrial to deduct an amount sufficient to pay taxes of every kind on the interest of each. No other deduction was authorized and no new division order was signed after plaintiff took over the lease.

---

2. Copied from plaintiff's brief. Emphasis supplied throughout this memorandum unless otherwise indicated.

3. Effective December 1, 1955.

4. Reserving 90% of 11/16ths of the production until $275,000 plus interest was paid.

Plaintiff did not submit statements for a proportionate part of the cost and operation of the compressor until September 1, 1956, although he did initiate discussions with defendants' attorneys in March and April as to whether defendants would agree to pay a part of the costs. He admits that defendants have not expressly contracted to pay any part of these expenses but insists that there is an implied obligation to do so.

There is no express provision in the lease as to the operation of a compressor. The parties agree that the "implied" agreement hinges upon a construction of the following gas royalty provisions in paragraph 6(b) of the original lease as to what would be paid the lessors: [5]

"(1) An equal one-fourth (¼) part of all condensate distillate, natural gasoline and other liquid hydrocarbons separated or extracted from such gas by the use of conventional type separator or separators at or near the wells, the same to be delivered free of cost to Lessor at the separator or to the credit of Lessor into any pipeline to which the separators may be connected at Lessor's election; and

"(2) An equal one-fourth (¼) part of the amount received by Lessees *at the well* when said gas, including casinghead gas or other gaseous substances produced from said land is sold *at the well by Lessees to others*; and

"(3) An equal one-fourth (¼) part of the *market value at the well* of such gas, including casinghead gas or other gaseous substances produced and saved from said land *when not sold at the well but used or sold off the leased premises* otherwise than for the purposes hereinafter set forth."

It is clear, and the parties concede, that paragraph (1) above is not applicable since no condensate, distillate, gasoline or other liquid hydrocarbons were so separated or extracted from the gas "at or near the wells."

Defendants contend that paragraph (2) applies—that gas is sold to Industrial *at the well* and they are entitled to ¼th of the amount paid by Industrial.

Plaintiff contends that paragraph (3) applies—that the gas is not *sold at the well* but is *used or sold off the leased premises*.

■ In asserting that paragraph (3) applies, plaintiff's counsel says on brief: "Therefore the decision hinges on whether the gas is sold *at the well* as contended by Mrs. Heard or if *it is not sold at the well*, but *used or sold* off the leased premises as contended by plaintiff." [6] (Emphasis his.) Counsel does not emphasize "off the leased premises" which, to my mind, is the most significant part of paragraph (3). It is clear that paragraph applies only where the gas is used or sold *off the leased premises*; and it is equally clear that here the gas is neither *used nor sold off the 25 acre lease*. It is sold and delivered to the pipeline *on the lease*. So paragraph (3) does not apply—although it sheds light on the meaning of *"sold at the well"* as used in paragraph (2); for paragraph (3) provides a royalty of ¼th of the market value *at the well* for gas *not sold at the well* but *used or sold off the leased premises*. This clearly indicates that gas is sold *at the well* within the meaning of paragraph (2) if it is sold and delivered, as here, *on the leased premises*. As will be demonstrated hereafter, this is the construction placed by all the parties on the royalty provision here involved until after plaintiff took over.

---

5. Defendant Sikes, owner of the overriding royalty, claims, in addition, that he cannot be charged with any portion of these costs by reason of the following particular language in his assignment; ". . . it being agreed that said overriding royalty shall be delivered to the said R. M. Sikes free and clear of all *development and operating costs and expenses into the pipe line* with which the wells *on said premises* may be connected."

6. Plaintiff's brief, pp. 3–4, emphasis his.

Plaintiff concedes the general rule that, where a lease provides for royalty on gas marketed or utilized by the lessee, there is an implied obligation upon the *lessee* to use reasonable diligence in marketing the gas [7] but says that this does not mean that the lessee is to pay *all* of the costs or expenses of marketing, transporting, processing or treating the gas, citing numerous cases where gas was not sold *at the well* or *on the lease* but was carried a great distance to market [8] or was enhanced in value by processing into by-products in expensive plants,[9] or both,[10] or depending on provisions altogether different from those used here.[11] Many other cases are cited and discussed by counsel on both sides. All are distinguishable on one or the other of the grounds noted above.

No case has been cited dealing with a fact situation like the one here, or holding that a fractional "part of the amount received by Lessees *at the well* when said gas * * * is sold *at the well* by Lessees to *others* * * *." (the language used in the applicable paragraph (2) of the lease) means at the well *head* or at the *mouth* of the well. If that were true, defendants would have had to share in the cost of the separator [12] and its operation although it is located 320 feet from the well head or mouth of the well.

■ Plaintiff says, however, that the only distinction between this case and those allowing charges for a proportionate part of large outlays for processing or expenses of transporting great distances, constructing and operating processing plants, etc., is one of degree only.[13] I do not think so in view of the language in the royalty clause and the facts here. The most that can be said for plaintiff, is that the meaning of "sold

---

7. Cole Petroleum Co. v. United States Gas & Oil Co., 121 Tex. 59, 41 S.W.2d 414, 86 A.L.R. 719; Masterson v. Amarillo Oil Co., Tex.Civ.App., 253 S.W. 908; 11 Tex.Law Review 401–438.

8. Kretni Development Co. v. Consolidated Oil Corp., 10 Cir., 74 F.2d 497, (where a pipe line was laid 90 miles by the lessee); Scott v. Steinberger, 113 Kan. 67, 213 P. 646; Robert v. Swanson, Tex. Civ.App., 222 S.W.2d 707.

9. Danciger Oil & Refineries, Inc. v. Hamill Drilling Co., 141 Tex. 153, 171 S.W.2d 321; Le Cuno Oil Co. v. Smith, Tex. Civ.App., 306 S.W.2d 190.

10. Matzen v. Hugoton Production Co., 182 Kan. 456, 321 P.2d 576.

11. Cf. Phillips Petroleum Co. v. Johnson, 5 Cir., 155 F.2d 185, calling for ⅛th of the *net* proceeds derived from gas *at the mouth of the well*.

12. A vessel used to separate the liquids from the gas which are produced together from a gas or oil well. Since the wells involved here do not produce oil, the separator is used to separate a small amount of water which is produced with the gas.

13. "The operation conducted by the Plaintiff in this case is admittedly a small one but the compressor unit had a *value* of $12,000 at the time he took over the lease and the expenses of operation of the entire 25 acre lease amounts to approximately $400.00 per month, 90% of which is attributable to the expenses of the operation and the maintenance of the compressor." (Plaintiff's brief, p. 14). It has been stipulated that the total cost of the compressor to Kelley, including installation costs, was $11,999.-71; and that the cost to Kelley for operating the lease after installing the compressor was:

"During the entire period Kelley Brothers continued to operate the lease after the compressor unit was installed, Kelley Brothers expended the sum of $153.45 for the purchase of three 55 gallon drums of Gulf Pride Oil, which was used in the operation of the compressor. During said entire period Kelley Brothers did not expend any additional sum as a direct expense of operating the compressor or operating the lease in general, they having performed the labor themselves, and having had no expense for repairs or other purposes in connection with operating the lease except the oil for the compressor as aforesaid. No expenditure was made for labor because one of the four Kelley Brothers went to the lease premises each day and performed such work as was done. It is therefore not possible to submit to the Court the approximate cost per month except to say that such costs consisted of an average of approximately $14.00 per month for oil plus the value of the labor performed by the Lessees themselves."

at the well to others" is doubtful; wherefore the construction placed thereon by the parties becomes important, entitled to great weight and, to my mind is decisive.[14] This rule has been applied to assignees who, as here, filed suit within a few months after acquiring a lease from assignors who had placed a certain construction upon contract or royalty provisions.[15]

 While, as stated, I am of the opinion that, on its face, paragraph (2) of the lease means that the lessee shall pay ¼th of the proceeds of all gas sold to Industrial *on the lease*, any doubt as to this is resolved by the practical construction of the parties. The facts showing this construction are as follows:

First: From the time of first production in November 1953, to January 1955, the gas passed from the well 320 feet and then through the separator *on the lease into Industrial's pipe line*. During all that time Kelley paid defendants without any deduction or claim for the cost of the separator or operation of the lease. Paragraph 8 of Kelley's sales contract with Industrial provided for delivery of the gas "to Buyer at the outside separator connection at the well presently on the premises covered by this contract and, if gas is delivered from future wells hereunder, at the outside separator connection of each such well." So during that time, before installation of the compressor, the parties construed the term "sold at the well" as meaning, not at the well head, but at the outside separator connection where the gas entered Industrial's pipe line *on the lease*.

Second: For eleven months *after the compressor was installed,* and during all the time that Kelley operated it, the parties placed the same construction on the

meaning of paragraph (2) above; that is, that "sold at the well to others" did not mean at the well but at the point *on the lease* where it entered Industrial's pipe line after passing through the compressor, ten feet farther from the well head than the separator. Paragraph 6 of the Kelley sales contract provided that Industrial should not be compelled to take gas "at a pressure not sufficient to enter the Buyer's pipe line" and that Industrial should not be obligated to install or operate compression facilities but that either party might do so at its option and cost. Kelley exercised this option by installing the compressor *on the lease,* 10 feet beyond the separator. Thus the point of delivery became, *under the sales contract,* at the place of entry into Industrial's pipe line *on the lease.* So the parties, after installation of the compressor, construed "sold at the well" as meaning not at the well head but the point *on the lease* where the gas entered into Industrial's pipe line.

Third: Plaintiff took over January 1, 1956, (effective December 1, 1955) and made no demand for payment of a proportionate part of the expenses until September 1, 1956, (although he did initiate discussions with defendants' attorneys in March or April 1956, seeking an *agreement* to pay).

 Fourth: The division orders authorized Industrial to deduct all taxes, state or federal, from the amount due to the parties, (royalty owners and Kelley), for their fractional interests in the proceeds of the gas. No deduction was authorized for any other charge. The division order was not changed when plaintiff bought Kelley's interest and has not been changed since.[16]

---

14. Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504; Livingston Oil Corp. v. Waggoner, Tex.Civ.App., 273 S.W. 903; Humble Oil & Refining Co. v. Reclamation Co., Tex.Civ.App., 58 S.W.2d 1082; Henshaw v. Texas Natural Resources Foundation, 147 Tex. 436, 216 S.W.2d 566; 10A Tex.Jur., 362–365; Navajo Production Corporation v. Pan-

handle Eastern Pipe Line Co., 5 Cir., 132 F.2d 1.

15. Lone Star Gas Co. v. X-Ray Gas Co., supra; Navajo Production Corporation v. Panhandle Eastern Pipe Line Co., supra.

16. Of course an assignee would not be bound by a *secret* construction placed

Defendants' motions for summary judgment are granted. The Clerk will notify counsel to submit an order accordingly.

upon a lease provision by the lessor and lessee, Stitz v. National Producing & Refining Co., Tex.Civ.App., 247 S.W. 657 (where, however, the terms of the lease were clear and unambiguous). The general rule is that the assignee steps into the shoes of the original lessee. Greenwood & Tyrrell v. Helm, Tex.Civ. App., 264 S.W. 221. There is no claim here that the construction placed by

Kelley and defendants was *secret*. I cannot conceive of plaintiff buying this working interest without a thorough investigation and consequent knowledge of the fact that Kelley had made no claim that defendants were liable for these charges. If plaintiff denies knowledge of this construction and desires to offer evidence on this point, the court will hear it.