Vernon C. PARKER, et al., Appellants,

v.

TXO PRODUCTION CORPORATION & Delhi Gas Pipeline Corp., Appellees.

No. 13–85–366–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 29, 1986.

Charles E. Neal, Edward L. Atkinson, Amarillo, for appellants.

W.S. Barron, Jr., Dallas, for appellees.

Before NYE, C.J., and DORSEY and KENNEDY, JJ.

## OPINION

DORSEY, Justice.

Two questions are raised in this appeal. First, did the operator of natural gas wells breach its implied covenant to market the gas, owed to royalty interest owners, by selling the gas to its wholly-owned subsidiary for a price effectively below market price? Second, did the operator improperly charge the royalty owners for their share of the cost of compressing the gas to increase production from the wells? The trial court denied relief to the royalty owners. We affirm on the first issue but reverse and remand on the second.

A simplified version of the facts is presented. The appellants executed oil and gas leases to the Texas Oil and Gas Corporation (Texas) in 1978. As offsets to a producing gas well drilled by another operator in the same geological formation, Texas soon drilled two wells on appellants' lands. Texas then sold the gas produced by the wells to its wholly-owned subsidiary, the Delhi Gas Pipeline Corporation (Delhi). Delhi constructed a pipeline to carry the gas to market. Texas later conveyed its interest as operator of the wells to another of its wholly-owned subsidiaries, the TXO Production Company (TXO).

Gas was successfully produced and sold for several years. Eventually, Delhi installed compressors to better deliver the gas from the wells into Delhi's pipeline system. Pursuant to its gas sales contract with Texas, Dehli then began to charge TXO five percent of the gross proceeds resulting from the sale of the gas. The royalties paid by TXO to appellants were thereby reduced, since, in net effect, the amount realized on the sale of the gas to Delhi was five percent less than the

amount realized would have been without compression.

Appellants brought suit, asserting that Texas, by agreeing to the five percent compression charge, breached an implied covenant to exercise good faith in marketing the gas, and that the contract was not negotiated at arms' length. Appellants also sued to recover an unrelated compression charge by TXO to increase production of gas from the wells. Trial was to the court, which found for the defendants on all points.

Appellants bring seventeen points of error, essentially involving two theories of recovery. Their first theory, found in their first seven points of error, is that Texas, by agreeing to the five percent deduction for compression, breached its implied duty to market the gas in good faith, citing *Amoco Production Co. v. First Baptist Church of Pyote*, 579 S.W.2d 280 (Tex.Civ.App.—El Paso 1979), *writ ref'd n.r.e.*, 611 S.W.2d 610 (Tex.1980). The Court of Appeals in *Pyote* recognized an implied covenant by the working interest owners to exercise good faith in marketing the gas of its royalty owners, particularly where the interests of the lessor and lessee are not identical. The Supreme Court approved the implied covenant to act in good faith in marketing the gas. *See Pyote*, 611 S.W.2d at 610; *cf., Le Cuno Oil Co. v. Smith*, 306 S.W.2d 190 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.), *cert. denied*, 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958).

In *Amoco Production Co. v. Alexander*, 622 S.W.2d 563 (Tex.1981), the Supreme Court dealt with the implied covenant to develop and protect the leasehold and held generally that:

The standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances. (Citations omitted.) Every claim of improper operation by a lessor against a lessee should be tested against the general duty of the lessee to conduct operations as a reasonably pru-

dent operator in order to carry out the purposes of the oil and gas lease.

*Id.* at 567–68. One of the implied covenants listed by the Supreme Court with approval is the implied covenant to produce and market. *Id.* at 567 n. 1. Thus, the Supreme Court has indicated that the reasonably prudent operator standard is the proper standard of review in all implied covenant cases.

Appellants' argument concerning the five percent compression charge centers on the interrelationship of Texas and Delhi. Appellants introduced evidence that other pipelines in the area were offering terms similar to Delhi's but without the five percent charge. When coupled with the fact that Delhi and Texas were interrelated, Texas, by agreeing to this extra charge, breached its implied covenant to market the gas in good faith, appellants conclude.

■ We agree with appellants that the sale of gas from Texas to its subsidiary is inherently suspect. The record reflects that at the time of Texas' sale of the gas to Delhi, the other pipelines were offering the maximum legal rate for natural gas. Delhi also offered this maximum price, but then deducted a five percent compression charge, while the other prospective purchasers did not make such a deduction. The net effect of the compression charge was to reduce the price Texas (and hence its royalty interest holders) received to ninety-five percent of the going rate.

■ We do not agree, however, that this fact alone means that Texas breached its implied covenant to market. In its per curiam opinion denying writ in the El Paso Court of Appeals' *Pyote* decision, the Supreme Court stated that "[a]lthough in a proper factual setting, failure to sell at market value may be relevant evidence of a breach of the covenant to market in good faith, it is merely probative and is not conclusive." Thus, other factors must be examined when deciding whether Texas has breached its implied covenant with the appellants.

At trial, several employees of Texas and TXO gave reasons for Texas' decision to sell the gas to Delhi. Frank Allen, a manager of oil and gas sales for TXO in the summer of 1980, testified by deposition. The gas was sold to Delhi sometime in the summer of 1980, but the written contract was not signed until September 22, 1980. Mr. Allen stated this occurred due to the drainage of the field by another operator's well and the concurrent need for haste. He said that other potential markets besides Delhi were considered and that Delhi was chosen partly because of its reputation of being capable of handling large amounts of gas. He testified that Texas did not concern itself with Delhi's possible profit or loss on a well. Other unaffiliated sellers were accepting terms similar to those which Delhi offered, and Delhi bought more gas from others than from TXO, under similar contract terms. He also viewed the potential compression as a means to increase production. In short, he testified that the decision to sell the gas to Delhi was arrived at in good faith and reasonably. "All things considered," he concluded, "this was the best that was available at that time."

John Lauderdale, Jr., testified by deposition that he was also a manager of oil and gas sales for Texas in the summer of 1980. His duty was to negotiate a favorable gas sales contract. He stated that the purpose of compression was primarily to enable the gas to flow into the pipeline from the well, in order to market the gas, if the gas would not feed naturally into the pipeline. He also stated that the five percent compression charge was a standard contract term offered by Delhi to all producers.

Testimony by other witnesses corroborated much of the above evidence.

Appellants called several witnesses to support their theory that the five percent charge by Delhi rendered Delhi's gas purchase contracts unacceptable. However, we have noted that other factors facing the operator at the time of his decision besides price should be considered in implied covenant cases, which we have outlined above.

The trial court specifically found that Texas and TXO acted in good faith and as reasonably prudent operators. Evidence in the record supports this conclusion. We overrule all of appellants' first seven points of error.

Appellants' eighth through tenth points of error essentially contend that the trial court should have pierced the corporate veils of TXO and Delhi and concluded that the sale of gas to Delhi was a sham transaction, collusive and without arms-length bargaining. Appellants cite *Texas Oil & Gas Corp. v. Hagen,* 683 S.W.2d 24 (Tex.App.—Texarkana 1984, writ granted).

*Hagen* involved a class action brought by several royalty owners against their oil and gas lessee, the Texas Oil & Gas Corporation. The trial court found that Texas' contract to sell natural gas to its wholly-owned subsidiary, Delhi, was a sham to deprive the plaintiffs of their rightful royalty. The Texarkana Court of Appeals affirmed this finding but noted that, merely because a subsidiary is wholly-owned by the parent and there is an identity of management, disregarding the corporate entity of the subsidiary is not justified. Only where management and operations are assimilated to the extent that the subsidiary is simply a name or a conduit through which the parent conducts its business may the corporate fiction be disregarded in order to prevent fraud and injustice. *Hagen,* 683 S.W.2d at 28. The Court then outlined the evidence justifying the trial court's finding, including (1) both companies had the same officers, directors, and office and field personnel; (2) TXO paid all of the payroll and controlled all of Delhi's business functions; (3) both companies filed consolidated income tax returns, and a single SEC registration and financial statement; (4) TXO owned all of Delhi's stock, and property in Delhi's name was included in a TXO mortgage to a New York bank. *Id.*

No such evidence exists in the case at bar. While there is evidence that the corporations involved herein do have some of the same directors, but there is no evidence

that Texas Oil and Gas treated Delhi as anything but an independent company. We find the facts of *Hagen* to be distinguishable and overrule appellants' eighth, ninth and tenth points of error.

■ Appellants' eleventh through sixteenth points of error are not briefed and are therefore waived. *Arnold v. Arnold,* 657 S.W.2d 506, 507 (Tex.App.—Corpus Christi 1983, no writ); TEX.R.CIV.P. 414.

■ Appellants' seventeenth and final point of error involves TXO's compression of the gas at the well-site. Appellants claim that TXO, the operator, improperly charged them for part of the compression costs.

TXO, independent of Delhi, also compressed the gas from appellants' wells. The crucial question is whether TXO's compression was a "production cost" or a "marketing cost." Production costs are the expenses incurred in exploring for mineral substances and in bringing them to the surface. Absent an express term to the contrary in the lease, these costs are not chargeable to the non-operating royalty interest. Costs incurred *after* production of the gas or minerals are normally proportionately borne by both the operator and the royalty interest owners. *See* 3 H. Williams & C. Meyers, *The Law of Oil & Gas* § 645.2 (1985). These "subsequent to production" costs include the expenses of compressing gas to make it deliverable into a purchaser's pipeline. *Id.; see also Le Cuno Oil Co. v. Smith,* 306 S.W.2d 190, 193 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.), *cert. denied,* 356 U.S. 974, 78 S.Ct. 1137, 2 L.Ed.2d 1147 (1958).

*Martin v. Glass,* 571 F.Supp. 1406 (N.D. Texas 1983), *aff'd without opinion,* 736 F.2d 1524 (5th Cir.1984), involved a Texas oil and gas lease and facts similar to those of the case at bar. Because of insufficient wellhead pressure, the operator installed a compressor to move the gas from the two producing wells on the lease into a nearby gathering line for marketing. The operator then deducted a proportionate part of the compression costs from the proceeds of production it owed to the royalty interest holders. Applying Texas law, the *Martin* court held that, on the basis of the royalty clause there involved, the royalty interest owners could properly be charged their proportionate share of the cost of compression. *Martin,* 571 F.Supp. at 1415–16. The Court's conclusion, however, relied on a determination that "production" of gas had already been obtained from the wells prior to the compression; i.e., there was sufficient pressure to bring the gas to the wellhead or mouth of the well before compression. *Id.* at 1415.

Whereas the operator's compression in *Martin* was necessary to deliver the gas into the purchaser's gathering line, and not to actually bring the gas to the mouth of the well, a different situation existed in the case at bar. J.D. Wisner, production engineer for TXO at the time in question, testified both by deposition and in person. Both times, he stated that the reason for TXO's installing the compressors was to *increase production* from the wells. TXO points to no evidence in the record to sustain the trial court's finding that TXO compressed the gas only in order to enable it to be *delivered* into Delhi's pipeline system; apparently, that was the purpose of Delhi's five percent compression charge.

The trial court found that TXO's compression was necessary to deliver the gas into Delhi's pipeline and that appellants, the royalty owners, were properly charged their proportionate shares of the compression costs. These findings are controlling in this Court only if there is some evidence of substantial and probative character to support them. *See Flato Electric Supply Co. v. Grant,* 620 S.W.2d 915, 917 (Tex.Civ. App.—Corpus Christi 1981, writ ref'd n.r. e.). Since no such evidence is apparent from the record, we sustain appellant's seventeenth point of error. We reverse the trial court's grant of compression charges to TXO and remand the case solely for a determination of this amount. In all other respects, the judgment is affirmed.