MARLIN ENERGY, INC. a Florida corporation, and Marlin Gas Transport, Inc., an Indiana corporation, Plaintiffs,

v.

SORLING, NORTHRUP, HANNA, CULLEN AND COCHRAN, LTD., an Illinois limited partnership, and Scott Helmholz, Defendants.

No. 00–3314.

United States District Court, C.D. Illinois, Springfield Division.

Feb. 7, 2003.

---

Eric D. Kaplan, Dean J. Papadakis, Kaplan Papadakis & Gournis, P.C., Chicago, IL, for Plaintiff.

David E. Jones, Mark M. Flannery, Hinshaw & Culbertson, Peoria, IL, for Defendant.

### *ORDER*

SCOTT, District Judge:

This matter comes before the Court on the parties' cross-motions for partial summary judgment and on Plaintiffs' Motion to Strike the Affidavit of Paul Croegaert and Any References to His Opinions in Defendants' Motion for Partial Summary Judgment. Defendant Sorling, Northrup, Hanna, Cullen and Cochran, Ltd. (Sorling) filed a lien against Plaintiffs Marlin Energy, Inc. and Marlin Gas Transport, Inc. (collectively Marlin) as the operator of certain gas wells located in Macoupin County, Illinois, pursuant to the Illinois Oil and Gas Lien Act of 1989, 770 ILCS 70/1 et seq. (Act).[1] The Act authorizes parties that provide labor and services, under an agreement with the well operator (or a

---

1. Marlin Gas Transport, Inc. is a wholly-owned subsidiary of Marlin Energy, Inc. Plaintiffs refer to themselves collectively as Marlin throughout their Motion for Partial Summary Judgment.

subcontractor of the operator), for operating gas wells to file a lien against the wells and proceeds from the wells for payment of such labor and services. Marlin filed this action to void the lien. Marlin also alleges additional claims against Sorling for damages resulting from the filing of the lien, and for legal malpractice. Sorling counterclaimed for its fees and to foreclose the lien. The parties have filed cross-motions for partial summary judgment regarding whether the lien is valid. For the reasons set forth below, the Court allows the Plaintiffs' Motion to Strike the Affidavit of Paul Croegaert and Any References to His Opinions in Defendants' Motion for Partial Summary Judgment. The Court further determines that the lien is valid to the extent of the value of Sorling's lienable services. The Court reserves ruling on the value of the services for later proceedings in this matter.

## STATEMENT OF FACTS

On December 20, 1998, Western Illinois Pipeline Group, Inc. (Western) assumed the rights of another company called SMTV, Inc. as the lessee of wells at the Plainview gas field located in Macoupin County, Illinois. Several different lessors leased the oil and gas rights to different portions of the Plainview field to SMTV and its assignee Western. The leases entitled the lessors to royalties of one-eighth of the sale price for all gas produced from the field.[2] Western and SMTV are owned by the same individual, Donald Reid. The wells existed for some time prior to the 1998 assignment between SMTV and Western, but no gas had been produced because the Plainview field was not connected to a pipeline or other distribution system. SMTV had been paying shut-in fees to the lessors. Such fees are necessary to keep the leases from expiring.

On April 2, 1998, Western and Marlin entered into a Gas Purchase Agreement (Agreement). *Plaintiffs' Memorandum (d/e 138)* Ex. A to Ex. 2. Under the Agreement, Marlin agreed to purchase gas from Western under certain conditions. The Agreement contemplated that Marlin would compress and dehydrate the gas onsite with its own equipment and then transport the gas by truck from the field to an end-user. Western agreed to pay Marlin a $20,000.00 set-up fee to cover the cost of installing Marlin's equipment on the site. Marlin retained 33 percent of the funds due Western under the Agreement until the set-up fee was paid. *Agreement* § II. 7.

Western agreed to install gathering pipes in the fields to deliver gas from at least three of the wells in the field to a central point in the field:

> Prior to installation of Buyer's transportation, compression and treatment equipment, Seller agrees to install a gathering system to a central delivery point as defined herein as the point of delivery from at least three (3) of Seller's wells along with an all weather loading site.

*Agreement* § II. 9.

The Agreement defined "point of delivery" as follows:

## V. POINT OF DELIVERY

1. The point of delivery of the gas to be delivered by Seller to Buyer hereunder shall be at a mutually agreeable point on a good all-weather road surface on Seller's leases in size and proportion as acceptable to Buyer. Seller understands that Buyer's tractor-trailer vehicles are 80,000 pounds gross weight each and such delivery point loading pad shall

2. One lessor, Thomas Carmody, negotiated a royalty of three-sixteenths of the sale price.

be constructed to appropriately accommodate Buyer loading operations.

2. As between the parties hereto, Seller shall be in exclusive control and possession of the gas deliverable hereunder and responsible for any damage or injury caused thereby until the same shall have been delivered to Buyer, after which delivery, Buyer shall be deemed to be in exclusive control and possession thereof and responsible for any injury or damage caused thereby. Title to the gas delivered hereunder shall pass at each point of delivery.

*Agreement § V.*

According to the Agreement, Marlin would then truck the gas to an end-user. Marlin paid Western a percentage of the price Marlin received from the end-user:

(a) The actual well head price for natural gas to be paid by Buyer to Seller (Seller's Price) for each Mcf of gas delivered by Buyer to Buyer's ultimate market shall be a percentage of the price actually paid to Buyer by Buyer's ultimate market (Buyer's Price) . . .

. . . .

(c) It is further agreed that Buyer shall have the right to suspend payment of any portion of the price otherwise payable by Buyer hereunder in the event payment to Buyer is suspended by Buyer's ultimate market.

(d) It is also agreed that in the event any money paid to Seller by Buyer which is later excluded and/or disallowed by means of a rate reduction by Buyer's ultimate market shall be promptly refunded to Buyer by Seller, together with interest thereon at a rate of 12% from the date such payment was made by Buyer.

*Agreement* § X. 1(a).[3] The percentage of Buyer's Price paid to Western increased as the volume of gas produced increased. *Id.* Marlin metered and calculated the volumes of gas produced and sold. *Id.* at § VII. The entire Agreement was conditioned on Marlin successfully negotiating a contract with an end-user, located within 40 miles of the point of delivery, that would pay Marlin at least $2.80 Mcf for the gas. *Id.* at § II. 10.

Beginning in April 1998, Marlin and Western extracted gas from wells located on the northwestern side of a railroad track that cut across the Plainview gas field. Marlin had negotiated an agreement to deliver gas to a facility operated by the Olin Corporation (Olin). Western installed a gathering system of pipes and equipment to de-water the gas. Marlin installed and operated the compressors and dehydrators, metering, and the truck loading equipment.

In December 1998, Western assigned its rights as operator of the field to Marlin. In December 1999, Western withdrew this assignment. The operations on the northwest side of the railroad track ended shortly after this withdrawal of the assignment.

In December 1999, the parties decided to move their operations to the southeast side of the railroad track. Western could not afford to install gathering pipelines on this side of the tracks. The parties amended the Agreement on December 30, 1999 (Amendment), to address Western's lack of funds. *Plaintiffs' Memorandum (d/e 138)* Ex. C to Ex. 2. Under the terms of the Amendment, Western assigned to Marlin all necessary rights to construct the gathering pipes on wells to be selected by Marlin. Marlin agreed to install, at its cost, a gathering system, including the sys-

---

3. "Mcf" means thousand cubic feet.

tem to remove water from the gas. The parties agreed that Western would receive a flat 20 percent of the Buyer's Price regardless of volume. Marlin was further authorized to retain 50 percent of all sums due Western as a production and gathering fee until Marlin had recovered 125 percent of the cost of the gathering system.

In early 2000, Marlin installed the gathering equipment and brought the gas to a central point where the de-watering equipment removed water from the gas. Marlin also set up its compression and dehydration equipment and arranged for construction of the truck loading pad at this point. According to Marlin's affiants, once installed Western took possession and control of the wells, gathering system, and de-watering equipment. *Plaintiff's Motion for Partial Summary Judgment (d/e 138)(Plaintiff's Motion)* Ex. 4, *Smith Affidavit* ¶ 13.

Marlin's affiants stated that once the gas was de-watered, the gas passed through a "title flange." Once through the title flange, Marlin took possession of the gas. Marlin compressed and dehydrated the gas and then pumped the gas into trucks which delivered the gas to Olin. *Id.* at Ex. 1, *Enerson Affidavit* ¶ 14, Ex. 4 *Smith Affidavit* ¶ 14.

In June 2000, the lessors and working interest owners of the wells in the southeast portion of the Plainview gas field sued Marlin, Western, and SMTV. *Lambeth v. Marlin Energy Inc., Macoupin County, Illinois Circuit Court Docket No. 2000–CH–44 (the Macoupin Action).* The First Amended Complaint in the Macoupin Action alleged that Marlin was the *de facto* operator of the well and was prematurely depleting the gas from the wells. The Macoupin Action Plaintiffs asked for (1) a preliminary injunction to stop depletion of the wells, (2) an accounting, (3) weekly reports of production, and (4) the deposit-

ing of all proceeds from the sale of gas into an escrow account. The Macoupin Action Plaintiffs also sought a declaratory judgment establishing that they were entitled to royalties and working interest payments based on the market value of the gas after compression and dehydration. *Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (d/e 50)* Ex. 1 at 11–13. They currently were receiving royalties and working interest payments based on the 20 percent paid to Western rather than the price that Olin paid Marlin.

Marlin retained Sorling to defend it in the Macoupin Action. Defendant Scott Helmholz is a partner of Sorling and was the principal attorney representing Marlin in the Macoupin Action. Marlin signed a retainer letter dated June 14, 2000. Sorling appeared in the Macoupin Action as counsel for Marlin. Sorling filed motions to dismiss, answers and affirmative defenses, and appeared at various hearings. These documents filed by Sorling denied that Marlin was an operator of the gas field. *See Plaintiffs' Response in Opposition to Motion for Abstention and for Stay (d/e 97)* Exs. 8–12.

The parties to the Macoupin Action negotiated a Consent Order for Preliminary Injunction, which was entered on September 22, 2000. Sorling represented Marlin in these negotiations. The Consent Order required the installation of metering equipment upstream of the title flange, limited the flow to twenty percent of open flow capacity, required Marlin to post a bond of $25,000.00, and required depositing royalty payments into an escrow account. *Id.* at Ex. 9.

Sorling billed Marlin for fees and expenses totaling $104,350.29 for the period from June through October 1998. *Plaintiff's Motion* Ex. 9. Marlin did not pay any of this amount to Sorling. Eventually, Sorling withdrew as counsel and filed the

gas lien for $104,350.29. *Id.* The lien stated that Marlin was the operator of the Plainview field. Sorling notified Olin of the lien. Once notified, Olin was obligated to withhold payment to Marlin. 770 ILCS 70/6. Olin refused to pay Marlin until the lien was resolved. Marlin then brought this action. Olin ultimately intervened and filed an interpleader action. The interpleader was resolved when Olin paid $108,981.69 into the Court.

### ANALYSIS

Marlin and Sorling/Helmholz have now filed cross-motions for partial summary judgment on the issue of whether Sorling had a valid basis for filing a lien under the Act. Each party must present evidence on its motion which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must consider the evidence presented by each movant in the light most favorable to the non-moving party. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has produced evidence showing that he is entitled to summary judgment, the non-moving party must present evidence to show that issues of fact remain. *Matsushita Elec. Ind. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 576, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

█ In connection with their Motion for Partial Summary Judgment, the Defendants submitted an Affidavit of Paul Croegaert. Croegaert is an attorney. He set forth in his Affidavit certain items in the record which he had reviewed and then offered his opinions of how the law should be construed in this case. He concluded that a "contract" existed between Sorling and Marlin, that Marlin was the "operator" as defined by the Oil and Gas Lien Act,

that in the alternative Marlin Energy was a "subcontractor" under the Act, that the content of Sorling's lien met the requirements of Section 10 under the Act, and that Sorling's lien was valid. The Court finds that Croegaert's Affidavit is improper to the extent it offers legal opinions and assumes the function of the Court in construing the Act in this case. To the extent the Affidavit recites factual matters relied upon by Croegaert, it is unnecessary to this Court's decision, since those factual matters are before the Court in other proper submissions by the parties in connection with the pending motions. Therefore, the Court allows Plaintiffs' Motion to Strike Croegaert's Affidavit; the Court will not consider that Affidavit in deciding the pending cross-motions for summary judgment.

█ In turning to the cross-motions for summary judgment, the Court notes first the language of the Act.

The Act states that:

Any person, ... who shall, under contract with the owner or operator ... perform ... services used ... for ... the ... operating of any oil or gas well ... shall be entitled to a lien under this Act, ... for the amount due him for the performance of such ... services....

770 ILCS 70/2. The Act lists legal services as lienable services. 770 ILCS 70/1(5). Sorling, thus, had a right to file its lien if (1) Marlin was an operator and (2) the legal services performed under the June 14, 2000, letter agreement between Marlin and Sorling were for operating the gas wells. The undisputed facts show that Marlin was an operator, and the services were used for purposes of operating the wells in the Plainview gas field. Thus, Sorling had a right to file a lien.

The Act defines the term "operator" as:

a person who is responsible for or assumes the daily supervision and management for operating a leasehold and

may be a co-owner of a leasehold interest.

770 ILCS 70/1(8). The term "operating" means, "all operations in connection with or necessary to the production of oil or gas." 770 ILCS 70/1(9). The definitions are functional, not formal; an operator is the person who is actually in charge of daily operations. It is undisputed that Marlin's personnel were on site daily supervising the dehydration and compression operations. The issue is whether those activities are necessary to the production process under the facts of this case. If so, Marlin was operating the wells and thus was an operator under the Act.

The parties have not cited any Illinois authority defining the activities which constitute production of gas, and the Court has not found any such authority from its own research. Other jurisdictions have adopted two differing definitions of the acts that constitute production of gas. One theory holds that production means removing the hydrocarbons from the Earth; once the gas comes out of the ground, production ends. *E.g., Martin v. Glass,* 571 F.Supp. 1406, 1415 (N.D.Tex.1983)(interpreting Texas law). A second theory holds that production means making the gas or oil marketable. Under this view, production includes all steps necessary to bring the hydrocarbons in question (in this case natural gas) to a marketable condition. *E.g., Rogers v. Westerman Farm Co.,* 29 P.3d 887, 904 (Colo.2001). Marketable condition means that the gas "is, in the physical condition such that it is acceptable to be bought and sold in a commercial marketplace." *Id.* at 906. The Oklahoma Supreme Court explained:

It is common knowledge that raw or unprocessed gas usually undergoes certain field processes necessary to create a marketable product. These field activities may include, but are not limited to, separation, dehydration, compression, and treatment to remove impurities.

*Mittelstaedt v. Santa Fe Minerals, Inc.,* 954 P.2d 1203, 1208 (Okla.1998). The *Mittelstaedt* Court held that these activities performed in the field in order to make the gas marketable are production activities. *Id.*

■ This Court holds that, for purposes of the Act, production of oil and gas includes more than the work and materials necessary to remove the oil or gas from the ground. The primary purpose of the Act is to protect those who provide labor and materials necessary to develop and operate oil and gas wells and pipelines. This purpose would be frustrated if "operating" under the Act ended when the gas left the well head. Under that construction, workers who maintained above ground equipment, such as Western's gathering pipes and de-watering equipment, could not file a lien because such equipment would not be necessary to sever the gas from the ground and so would not be necessary for production. Their work would also not be considered part of operating the well. That result is not what the Act intended. Such laborers and material men in the field should be able to file liens to recover payment for their labor and materials. The definition of "operating" under the Act should include all operations in connection with or necessary to make oil or gas marketable, at least with respect to activities that occur in the oil or gas field.[4]

---

4. The Colorado and Oklahoma Courts disagree over whether activities away from the field should constitute production activities. *See Rogers,* 29 P.3d at 906, n. 26. This Court does not need to address this conflict since

Marlin's compression and dehydration activities would constitute production activities under either the Oklahoma or Colorado Court's analysis.

In this case, Marlin was operating the gas wells. Marlin took raw gas from the gathering system in the field and compressed it and dehydrated it in order to make it marketable to the end-user Olin. Once Olin paid for the gas, Marlin paid Western its 20 percent share of the purchase price. The Agreement contemplated that compression and dehydration would be needed to turn the raw gas into a marketable product that a buyer in a commercial gas market would purchase. The Oklahoma Supreme Court stated, as quoted above, that dehydration and compression in the field are often necessary to make raw gas marketable. *Mittelstaedt,* 954 P.2d at 1208. It is undisputed that Marlin performed these functions in the Plainview gas field. It thus was operating that part of the production of gas from these wells for purposes of the Act, and so was an operator for purposes of the Act.

Marlin argues that the gas was marketable in its de-watered state at the title flange because Marlin purchased the gas from Western in that condition. Since Marlin purchased it in this form at the title flange, the gas must have been marketable. Since it was marketable, the logic goes, production stopped at that point; Marlin's activities were not part of production, and so were not part of operating the wells.

This Court disagrees. The terms under which Marlin took the gas at the title flange are not those that would result in a commercial market for purchase and sale of natural gas. Marlin was not obligated to pay Western anything when it took possession of the gas at the title flange. Marlin further was not obligated to pay Western anything based on the quantity of raw gas received at the title flange. Marlin had to compress, dehydrate and deliver the gas first. Western then received 20 percent of the "price *actually paid to Buyer* by Buyer's ultimate market," for the quantity of dehydrated, compressed gas delivered to Marlin's ultimate market, Olin. *Agreement* § X. (a), as amended by the Amendment (emphasis added). Marlin further could suspend payment to Western if Olin suspended payment to Marlin; and, if Marlin somehow had to return part of the purchase price to Olin, Western had to reimburse a proportionate share of the money Marlin had paid it. *Id.* at § X. (c) and (d).

These terms are not those that would occur in a commercial market for the sale of gas. Rather, these terms reflect an agreement between two parties to divide the responsibilities in the gas production process. Western agreed to operate the wells and the gathering system, and Marlin agreed to operate the compression and dehydration equipment. They then sold the now marketable gas to the ultimate user, Olin, and divided the proceeds from that sale. Marlin and Western were operating these wells together. Marlin thus was an operator for purposes of the Act.

■ Marlin further used Sorling's services to maintain its operation of the Plainview gas wells. The Macoupin Action Plaintiffs sought a preliminary injunction to limit the flow of gas and to escrow all the proceeds from Marlin's sale of gas from the Plainview field. If successful, the Macoupin Action Plaintiffs would have interfered with the operations of these wells. Marlin hired Sorling to defend it against these efforts to interfere with well operations. Marlin thus used Sorling's services for operating the wells. Legal services are expressly included within the definition of lienable services under the Act. Sorling, therefore, had a valid basis for filing a lien for the value of its services that Marlin used to keep the wells operating. Sorling is entitled to partial summary judgment on the issue of whether it was entitled to file a lien under the Act for its services ren-

dered in connection with the defense of the Macoupin Action. The appropriate value of those services for which Sorling may assert a lien remains an issue in this case.

This Court's ruling is limited to the meaning of "operating" and "operator" under the Act. This Court has not addressed the rights or obligations that may or may not exist between Marlin and the Macoupin Action Plaintiffs. Their rights are presumably defined by their contracts, and this Court has not addressed the terms of those contracts.

THEREFORE, the Court allows Plaintiffs' Motion to Strike the Affidavit of Paul Croegaert and Any References to His Opinions in Defendants' Motion for Partial Summary Judgment (d/e 145). In addition, the Defendants' Motion for Partial Summary Judgment (d/e 140) is ALLOWED, and the Plaintiffs' Motion for Partial Summary Judgment (d/e 138) is DENIED. The Court finds that Sorling had a right to assert a valid lien under the Illinois Oil and Gas Lien Act. The Court reserves ruling at this time on the appropriate value of those services for which Sorling may assert a lien. The matter is further referred to U.S. Magistrate Judge David G. Bernthal for the purpose of conducting a settlement conference. Expert discovery remains stayed pending the outcome of the settlement conference. The pretrial conference date of July 11, 2003, and trial date of August 4, 2003, remain set. The parties are directed to contact Judge Bernthal's office to schedule the settlement conference.

IT IS THEREFORE SO ORDERED.